**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**USA ENTERTAINMENT GROUP, INC.,**
**a Florida corporation d/b/a CLUB**
**CINEMA,**

|                    |                   |
|--------------------|-------------------|
| **Plaintiff,**     | **Case No.**      |
| **v.**             | **HONORABLE**     |

**SHERIFF SCOTT ISRAEL IN HIS OFFICIAL**
**CAPACITY; SHERIFF SCOTT ISRAEL,**
**individually; CAPTAIN WAYNE ADKINS;**
**the CITY OF POMPANO BEACH, a Florida**
**municipal corporation; LAMAR FISHER,**
**in his individual capacity; and CHARLOTTE**
**BURRIE, in her individual capacity; jointly**
**and severally,**

        **Defendants.**

## COMPLAINT FOR DAMAGES

      Plaintiff USA ENTERTAINMENT GROUP, INC. d/b/a CLUB CINEMA, by

and through its attorneys, hereby state for its Complaint against Defendants

SHERIFF SCOTT ISRAEL IN HIS OFFICIAL CAPACITY; SHERIFF SCOTT

ISRAEL, individually; CAPTAIN WAYNE ADKINS; THE CITY OF POMPANO

BEACH, FLORIDA; LAMAR FISHER, individually; and CHARLOTTE BURRIE,

individually, jointly and severally, as follows:

### NATURE OF THE ACTION AND JURISDICTION

      This is a civil action:

(a)     arising under the Constitution and laws of the United States and this Court has original federal jurisdiction pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 1964;

(b)     to redress the deprivation, under the color of law, of the rights, privileges and immunities of plaintiff secured by the Constitution of the United States providing for equal rights of its citizens and of all persons of any jurisdiction of the United States, and this Court has original jurisdiction pursuant to 28 U.S.C. §1343(3); and

(c)     for monetary and declaratory judgment and injunctive relief pursuant to 42 U.S.C. §1983, and this Court has jurisdiction pursuant to 28 U.S.C. §1343(4).

The principal events giving rise to the claims stated herein occurred in this District, and venue is therefore proper in this District pursuant to 28 U.S.C. §1391(b).

This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §2201 and §2202.

## <u>THE PARTIES</u>

1.     Plaintiff USA Entertainment Group, Inc. d/b/a Club Cinema ("Club Cinema") is a corporation, organized and existing under the laws of Florida, with its principal place of business located in Broward County, Florida.

2.     Defendant Sheriff Scott Israel in his official capacity ("BSOC") is the Sheriff of the County of Broward ("the County") and head of the Broward Sheriff's

Office, which is located in Broward County, Florida.  As Sheriff, defendant Israel is a policy-making and decision-making official.

3.     Defendant Sheriff Scott Israel in his individual capacity ("Sheriff Israel individually") is the Sheriff of the County of Broward and head of the Broward Sheriff's Office, and, upon information and belief, resides in Broward County, Florida.  As Sheriff, defendant Israel is a policy-making and decision-making official.

4.     Defendant Captain Wayne Adkins is a Captain employed by the BSOC, and upon information and belief, resides in Broward County, Florida.

5.     Defendant the City of Pompano Beach, Florida ("the City") is a municipal corporation, organized under the laws of the State of Florida, with its principal offices in Broward County, Florida.

6.     Defendant Lamar Fisher is Mayor of the City of Pompano Beach, who, upon information and belief, resides in Broward County, Florida, and who is being sued in his individual capacity.  As Mayor, defendant Fisher is a policy-making and decision-making official for the City.

7.     Defendant Charlotte Burrie is the Commissioner for District 2 on the City Commission of the City of Pompano Beach, who, upon information and belief, resides in Broward County, Florida, and who is being sued in her individual capacity.  As Commissioner, defendant Burrie is a policy-making and decision-making official for the City.

**GENERAL ALLEGATIONS**

8.      The property that is the subject of this Complaint is located at 3251 N. Federal Highway, Pompano Beach, Florida ("the Subject Property").

9.      Club Cinema opened in 2006, after plaintiff had invested $12,000,000 in building the facility, which has the capacity for 2,500 patrons.

10.      During the time Club Cinema was being planned, designed and constructed, Club Cinema received all necessary permits and licenses from the County, because the Subject Property had not yet been annexed into the City.

11.      Club Cinema operates both as a nightclub and as a music venue, at which live concerts and electronic dance music shows are performed for patrons.  Before the occurrence of the wrongful acts of which plaintiff complain in this complaint, Club Cinema would host approximately 40 such concerts and shows a year.

12.      Club Cinema is a for-profit business that operates on private property.  Access to the venue is permitted only after patrons have paid a fee to enter the parking area, and then an additional fee for entry into the nightclub.  Neither the parking area nor the night club is open to unrestricted access by the public.

13.      Since 1999, the City has contracted with the BSOC to provide law enforcement and police services within the City's municipal boundaries.

14.      The BSOC is responsible for the conduct of the deputies of the Broward County Sheriff's Office.

- 4 -

**COUNT I**
**CLAIM FOR FIRST AMENDMENT RETALIATION**
**AGAINST DEFENDANTS THE CITY, BURRIE AND FISHER**

15.     Commissioner Burrie contacted representatives of Club Cinema,
primarily Samuel Frontera, and indicated that, if Club Cinema wanted to continue
in business peacefully, Club Cinema would have to give the City a portion of the
Subject Property at no cost so that it could be made into a community center,
named after Commissioner Burrie.

16.     There was no basis on which the City and/or Commissioner Burrie
could demand that plaintiff "gift" the City with a community center - at plaintiff's
sole expense - whether or not it was named in honor of Commissioner Burrie.

17.     Once Club Cinema refused to give the City a community center at
Club Cinema's expense, the City, Fisher and Burrie directed the BSOC to carry
out, and the BSOC did carry out, excessive and unwarranted policing activity at
the Subject Property, designed to cause Club Cinema to go out of business.

18.     At the next event after Club Cinema communicated to the City that
it refused to give the City a community center on the Subject Project at Club
Cinema's expense, Club Cinema leased the venue to a promoter for a hip hop
event for a weekend event.

19.     At that event, the BSOC, on its own and at the direction of the City
and Commissioner Burrie, sent to the Subject Property a tactical team,
helicopters and K-9 units with transportation vans (also known as paddy
wagons).

20.     Cory Weisman, a manager at Club Cinema, approached the sergeant in charge of the operation to protest this action, and was told by the sergeant that he had been told by the Sheriff and Captain Adkins that this venue was going to be shut down by 2:00 a.m., or arrests would be made.

21.     Mr. Weisman contacted Captain Adkins, and advised him that the police presence was intimidating potential concertgoers, and that the officers were telling those seeking to enter the venue not to purchase tickets because the venue was going to be closed down, but the police activity did not cease.

22.     Beginning in 2013, and continuing through 2016, the City, alone and/or at the direction of Mayor Fisher and/or Commissioner Burrie, intentionally directed the BSOC to engage in an official policy and a practice of excessive and unwarranted police activity at Club Cinema.

23.     On March 3, 2013, at the Excision show, there again was excessive and unwarranted police presence, with officers again telling potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

24.     On April 6, 2013, at the Crizzly concert, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

25.     On April 19, 2013, at the Electric Flurry show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

26.     On April 26, 2013, at the Flux Pavilion show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

27.     On May 11, 2013, at the hip hop Ace Hood show, the BSOC had over 50 officers present in SWAT gear.  This level of policing was designed to deter potential patrons, who were primarily black.  There were no more than 250 patrons at this show, a small fraction of the crowd which usually would patronize this show.

28.     A few days after the Ace Hood show, a BSOC sergeant approached a Club Cinema manager, and sarcastically asked how the show went.  The manager answered that, with all of the officers in tactical gear, the potential clientele was deterred from attending.  The sergeant replied, "I think that was the idea!"

29.     On May 18, 2013, at the May Daze show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

30.     On October 31, 2013, at the 4th Annual Tricks  or Beats event, a Halloween show featuring DJ Twinz Beatz, there were a large number of BSOC officers on the Subject Property.  Some of the officers were dressed in military tactical gear, including balaclavas (or ski masks), tactical vests and military-style uniforms.  There were also a large number of BSOC vehicles on the Subject Property, including several marked patrol cars, two unmarked SUVs, an unmarked sedan and a transportation van.  The police activity was excessive and unwarranted (photographs of the police activity at Club Cinema on October 31, 2013 are attached hereto as Exhibit 1).

31.     On November 16, 2013, at a show featuring DJs Darude and Vaski, there were both marked and unmarked police cars, and at least six police officers dressed in riot uniforms, with one of the officers wearing a balaclava.

32.     On January 18, 2014, at a DJ Carnage show at the venue, there were between 25-30 BSOC officers on the Subject Property, and at least a dozen patrol cars with flashing lights.  Three patrol cars with flashing lights parked on the Subject Property directly in front of the entrance to the venue, and were later

that evening joined by another four patrol cars with flashing lights, as well as a canine unit.

33.     A BSOC sergeant, Sergeant Craig Bachan, and five other BSOC officers came into the venue without invitation or a search warrant, and went to the stage where DJ Carnage was performing.  Sergeant Bachan took the microphone, told DJ Carnage to stop the music, and told the approximately 1,900 patrons that the venue was being closed down and that they had to leave immediately.  The BSOC officers herded all the patrons out of the building.

34.     On March 1, 2014, at the Excision show, there were eight to ten BSOC officers, in SWAT gear, were on the Subject Property directly in front of Club Cinema, as well as several BSOC SUVs (photographs showing the BSOC officers in SWAT gear are attached hereto as Exhibit 2).

35.     This list of dates and incidents is not an exhaustive list of the excessive and unwarranted police activity at the Subject Property, as that activity continued through 2016.

36.     The official policy and practice of excessive and unwarranted police activity at Club Cinema on the part of the City and the BSOC continued from 2013 through 2016, until Club Cinema was forced to cease shows because promoters, artists and patrons no longer wanted to appear at Club Cinema because of the excessive and unwarranted police activity.

37.     The intended result of the official policy and practice of the City and the BSOC of excessive and unwarranted police activity at Club Cinema, especially when the police activity included officers wearing SWAT or riot gear

and ski masks, was done to intimidate and harass plaintiff, the patrons of Club Cinema and the artists and promoters who performed there.

38.     The City and/or Mayor Fisher and/or Commissioner Burrie directed the BSOC to carry out, and the BSOC did carry out, these police activity in such a manner as to create apprehension and fear in the potential patrons that a dangerous and high-profile crime scene was underway at the Subject Property.

39.     The false portrayal of a dangerous and high-profile crime scene at the Subject Property caused many potential patrons to decline to enter the Subject Property and/or venue, causing Club Cinema to experience a significant decline in attendance and loss of revenue.

40.     Cory Weisman and Steve Brown, managers of Club Cinema, met with then-Vice Mayor and Commissioner George Brummer to discuss the City's demand that Club Cinema close on the weekends at 2:00 a.m.  Mr. Brummer directed Mr. Weisman and Mr. Brown to speak with Commissioner Burrie, because the Subject Property was in her district and she had a close relationship with Mayor Fisher and the BSOC, particularly Captain Adkins.

41.     Mr. Weisman and Mr. Brown met with Commissioner Burrie and explained to her that, under the provisions of the City's code, Club Cinema could operate until 4:00 a.m.  Commissioner Burrie did not dispute these facts with Mr. Weisman and Mr. Brown, but reiterated the demand that, if Club Cinema wanted to operate without excessive and unwarranted police activity, then Club Cinema had to close earlier than allowed by the City Code and had to donate a portion of the Subject Property for a community center named after Commissioner Burrie.

42.     Mr. Weisman and Mr. Brown made repeated trips to City Hall to speak to City representatives regarding the excessive and unreasonable and unwarranted police activity by the BSOC at the Subject Property.  In these conversations, Mr. Weisman and Mr. Brown were told to focus on Mayor Fisher and Commissioner Burrie, because they were the decision-makers directing that the BSOC carry out the police activity at the Subject Property, and that while the Commissioners were aware of the activity, they would take no action to stop it.

43.     Mr. Weisman and Mr. Brown made several attempts to meet with Mayor Fisher, but he never was available when they tried to set up meetings or when they called him, and they never received any return telephone calls.

44.     Mr. Weisman and Mr. Brown finally went to Mayor Fisher's place of business, Fisher Auction House, where Mayor Fisher was in and unable to avoid speaking with Mr. Weisman and Mr. Brown.  Mayor Fisher advised Mr. Weisman and Mr. Brown that Captain Adkins was his longtime personal friend, and that Mayor Fisher was not only aware of the actions of the BSOC and Captain Adkins, but was directing them as well.

45.     Mayor Fisher advised Mr. Weisman and Mr. Brown that the demand that Club Cinema close down before the time permitted by City Code had nothing to do with Club Cinema or how it conducted its business.

46.     Instead, Mayor Fisher said the City viewed Club Cinema in the same light as the adult entertainment establishments in the City (despite the fact that the entertainment offered at Club Cinema was not "adult entertainment" or sexually oriented).  The demand that Club Cinema close earlier than required by

the City Code was made so that the City Commissioners could remain popular with the voting population in the City.

47.    Mayor Fisher told Mr. Weisman and Mr. Brown that he was aware of the cultural importance and national visibility of the venue, and that several weeks earlier he had attended a Brazilian gospel event at Club Cinema, which did not have excessive police activity.  Nevertheless, he was adamant that Club Cinema would continue to be targeted with excessive police activity until the venue agreed to close early.

48.    Mr. Weisman documented all of these events set forth in the preceding paragraphs in a letter which he sent on June 13, 2013 to Robert Pereira, who was the campaign fundraiser for Sheriff Israel and who was appointed to the Board of Advisors for the County.  Mr. Weisman never received a response to his letter from Mr. Pereira or anyone else.

49.    After meeting with Mayor Fisher, Mr. Frontera, Mr. Weisman and Mr. Brown met with Commissioner Burrie to ask that the excessive and unwarranted police activity stop.

50.    During that meeting, Mr. Frontera said that there was an upcoming mayoral election, and that he and other members of management would have to support a different candidate if the wrongful, harassing activity did not stop.

51.    Commissioner Burrie then jumped out of her chair and vehemently said, "You will never beat Lamar, no matter who you decide to support." Commissioner Burrie began speaking angrily, stating that no one would oppose her lifelong friend, Mayor Fisher, whom she had bounced on her knee when he

was young.  Commissioner Burrie told Mr. Frontera, Mr. Weisman and Mr. Brown

that she was furious that they had not done what she wanted as to the

community center and with the indication that they would not be supporting

Mayor Fisher for re-election and said that the excessive police activity would not

stop until Club Cinema was finally out of business.

52.     Some time after this meeting had concluded, Mr. Brown happened

to be in the same place as Commissioner Burrie, and so again raised that the

excessive police activity needed to cease.  Commissioner Burrie said to Mr.

Brown, "Oh yeah, well, guess what?  That's not gonna stop until we finally put the

club out of business."

53.     Throughout all the relevant times in this complaint, Club Cinema

had no code violations or citations or other infractions, and was never cited for

anything, despite the excessive police presence.

54.     In addition to the excessive and unwarranted police activity, the

City directed the BSOC, and the BSOC did, interfere with Club Cinema's shows

and shut them down before the close of business, without provocation or

justification, solely to destroy Club Cinema's business, reputation and ability to

attract paying customers to future shows and artists to perform at future shows.

55.     On November 6, 2013, counsel for plaintiff sent a letter to the City,

directed to the attention of City Attorney Mark Berman, setting forth some of the

wrongful actions taken against Club Cinema by the City and the BSOC (a copy of

the letter to the City of Pompano Beach, attention: City Attorney, Mark Berman,

Esq. from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 3).

56.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of City Attorney Gordon B. Linn, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: City Attorney, Gordon B. Linn, Esq. from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 4).

57.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of City Manager Dennis W. Beach, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: City Manager, Dennis W. Beach, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 5).

58.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of Mayor Lamar Fisher, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: Mayor Lamar Fisher, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 6).

59.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of Vice-Mayor George Brummer, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: Vice-Mayor George Brummer, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 7).

60.     As set forth in the November 6, 2013 letters to the City, Club Cinema demanded that the harassment of it stop, specifically referring to the fact that the City directed the BSOC, and the BSOC carried out, police details at Club Cinema which significantly impaired Club Cinema's ability to conduct business. These police details included the presence of at least five to six police cars, fire trucks, officers in tactical gear, officers in ski masks and officers themselves bringing illegal drugs onto the premises of Club Cinema (Exhibits 3-7).

61.     In the November 6, 2013 letters to the City, Club Cinema advised the City that it was aware that the City had directed the BSOC, and the BSOC carried out, warrantless entries into Club Cinema's building by entering the building after purchasing a ticket which was intended for the club patrons only, and demanded that such warrantless entries cease (Exhibits 3-7).

62.     As further wrongful activity, the City filed suit in state court, naming as defendants in that action Club Cinema and Marie Frontera, alleging that Club Cinema was public nuisance ("State Court Lawsuit").

63.     At all times, plaintiff in this action wanted the State Court Lawsuit to be litigated, because there was no truth to the City's allegations.

64.     The City used every maneuver possible to delay resolution of the case, until the case was finally dismissed on November 3, 2016 without any action or judgment against Club Cinema or Marie Frontera.

65.     The City, Mayor Fisher and Commissioner Burrie have made clear that they want Club Cinema not only to be closed, but that building be torn down and the Subject Property developed as a Wal-Mart location (Exhibit 8).

66.     Club Cinema was exercising its First Amendment rights when they refused to donate land to the City for the purpose of building a community center, by supporting a mayoral candidate other than defendant Fisher, and by defending against the City's unwarranted nuisance lawsuit.

67.     The above-described actions, taken either directly by defendants the City, Fisher and Burrie or at their direction, were in retaliation of plaintiff's exercise of their First Amendment rights.

68.     The above-described actions, taken either directly by defendants the City, Fisher and Burrie or at their direction, were actions taken under color of state law.

69.     The City had a policy, custom and/or practice of taking actions against plaintiff to deprive it of its constitutional rights.

70.     The City officially sanctioned and/or ordered the unconstitutional actions against plaintiff set forth in Count I of this complaint.

71.     The final decision-makers of the City acquiesced in the practice of taking actions against plaintiff to deprive it of its constitutional rights such that, since 2013, it became the City's standard operating procedure as to plaintiff.

72.     The City ratified its policy, custom and/or practice of taking actions against plaintiff to deprive it of its constitutional rights by the fact that those with final policy making authority adopted the unconstitutional decisions of subordinate public officials.

73.     As a matter of policy, custom and/or practice, the City and Fisher and Burrie ignored plaintiff's fundamental rights.

74. The actions of the City and Fisher and Burrie in retaliating against plaintiff for exercising its First Amendment rights constitute a deliberate denial, under color of law, of plaintiff's federal rights guaranteed under the First Amendment to the United States Constitution, which is actionable under 42 U.S.C. §1983.

75. Plaintiff has suffered injury as a result of the actions of the City and Fisher and Burrie.

WHEREFORE, plaintiff respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below, and enter a judgment in an amount to be determined by this Honorable Court and a jury, plus costs, interest and attorneys' fees.

**COUNT II**
**CLAIM FOR FIRST AMENDMENT RETALIATION AGAINST DEFENDANTS SHERIFF SCOTT ISRAEL IN HIS OFFICIAL CAPACITY, SHERIFF SCOTT ISRAEL IN HIS INDIVIDUAL CAPACITY AND CAPTAIN WAYNE ADKINS**

76. Beginning in 2013, and continuing through 2016, the BSOC intentionally engaged in an official policy and a practice of excessive and unwarranted police activity at Club Cinema.

77. The BSOC sent to the Subject Property on numerous occasions a tactical team, helicopters and K-9 units with transportation vans (also known as paddy wagons).

78. Cory Weisman, a manager at Club Cinema, approached the sergeant in charge of the operation to protest these actions, and was told by the sergeant that he had been told by the Sheriff and Captain Adkins that this venue was going to be shut down by 2:00 a.m., or arrests would be made.

79.     Mr. Weisman contacted Captain Adkins, and advised him that the police presence was intimidating potential concertgoers, and that the officers were telling those seeking to enter the venue not to purchase tickets because the venue was going to be closed down, but the police activity did not cease.

80.     On March 3, 2013, at the Excision show, there again was excessive and unwarranted police presence, with officers again telling potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

81.     On April 6, 2013, at the Crizzly concert, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

82.     On April 19, 2013, at the Electric Flurry show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

83.     On April 26, 2013, at the Flux Pavilion show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential

concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

84.    On May 11, 2013, at the hip hop Ace Hood show, the BSOC had over 50 officers present in SWAT gear.  This level of policing was designed to deter potential patrons, who were primarily black.  There were no more than 250 patrons at this show, a small fraction of the crowd which usually would patronize this show.

85.    A few days after the Ace Hood show, a BSOC sergeant approached a Club Cinema manager, and sarcastically asked how the show went.  The manager answered that, with all of the officers in tactical gear, the potential clientele was deterred from attending.  The sergeant replied, "I think that was the idea!"

86.    On May 18, 2013, at the May Daze show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

87.    On October 31, 2013, at the 4th Annual Tricks  or Beats event, a Halloween show featuring DJ Twinz Beatz, there were a large number of BSOC officers on the Subject Property.  Some of the officers were dressed in military tactical gear, including balaclavas (or ski masks), tactical vests and military-style

uniforms.  There were also a large number of BSOC vehicles on the Subject Property, including several marked patrol cars, two unmarked SUVs, an unmarked sedan and a transportation van.  The police activity was excessive and unwarranted (photographs of the police activity at Club Cinema on October 31, 2013 are attached hereto as Exhibit 1).

88.     On November 16, 2013, at a show featuring DJs Darude and Vaski, there were both marked and unmarked police cars, and at least six police officers dressed in riot uniforms, with one of the officers wearing a balaclava.

89.     On January 18, 2014, at a DJ Carnage show at the venue, there were between 25-30 BSOC officers on the Subject Property, and at least a dozen patrol cars with flashing lights.  Three patrol cars with flashing lights parked on the Subject Property directly in front of the entrance to the venue, and were later that evening joined by another four patrol cars with flashing lights, as well as a canine unit.

90.     A BSOC sergeant, Sergeant Craig Bachan, and five other BSOC officers came into the venue without invitation or a search warrant, and went to the stage where DJ Carnage was performing.  Sergeant Bachan took the microphone, told DJ Carnage to stop the music, and told the approximately 1,900 patrons that the venue was being closed down and that they had to leave immediately.  The BSOC officers herded all the patrons out of the building.

91.     On March 1, 2014, at the Excision show, there were eight to ten BSOC officers, in SWAT gear, were on the Subject Property directly in front of

Club Cinema, as well as several BSOC SUVs (photographs showing the BSOC officers in SWAT gear are attached hereto as Exhibit 2).

92.     This list of dates and incidents is not an exhaustive list of the excessive and unwarranted police activity at the Subject Property, as that activity continued through 2016.

93.     The official policy and practice of excessive and unwarranted police activity at Club Cinema on the part of the BSOC continued from 2013 through 2016, until Club Cinema was forced to cease shows because promoters, artists and patrons no longer wanted to appear at Club Cinema because of the excessive and unwarranted police activity.

94.     On November 6, 2013, counsel for plaintiff sent a letter to the BSOC, directed to the attention of Sheriff Israel, setting forth some of the wrongful actions taken against Club Cinema by the BSOC (a copy of the letter to the Public Safety Building, attention: Sheriff of Broward County, Scott Israel, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 9).

95.     As set forth in the November 6, 2013 letters to the BSOC, Club Cinema demanded that the harassment of it stop, specifically referring to the fact that the BSOC carried out police details at Club Cinema which significantly impaired Club Cinema's ability to conduct business.  These police details included the presence of at least five to six police cars, fire trucks, officers in tactical gear, officers in ski masks and officers themselves bringing illegal drugs onto the premises of Club Cinema (Exhibit 9).

96.     In the November 6, 2013 letters to the BSOC, Club Cinema advised the BSOC that it had carried out warrantless entries into Club Cinema's building by entering the building after purchasing a ticket which was intended for the club patrons only, and demanded that such warrantless entries cease (Exhibit 9).

97.     In response to the letter, the BSOC did not cease or desist from the actions of which plaintiff complained, but instead, as certain BSOC officers have admitted under oath, they began to bribe people to let them into Club Cinema secretly, paying as much as $60 per officer, and used threats to the door security, so that they could enter the club without warrants and without having to purchase tickets.

98.     In addition to the excessive and unwarranted police activity, the BSOC interfered with Club Cinema's shows and shut them down before the close of business, without provocation or justification, solely to destroy Club Cinema's business, reputation and ability to attract paying customers to future shows and artists to perform at future shows.

99.     As part of their plan to destroy Club Cinema's business and reputation and shut down the venue, the BSOC, Sheriff Israel individually, Captain Adkins targeted plaintiff, the Subject Property and its patrons for inspections; unwarranted questioning, stopping and detaining of patrons; selective ticketing of patrons; and other such actions.

100.    This excessive and unwarranted police scrutiny of plaintiff, the Subject Property and its patrons caused patrons and potential patrons not to patronize the venue, causing financial hardship and detriment to plaintiff.

101.    These unwarranted and wrongful tickets and charges were an abuse of the BSOC's power and authority.

102.    The false portrayal of a dangerous and high-profile crime scene at the Subject Property caused many potential patrons to decline to enter the Subject Property and/or venue, causing Club Cinema to experience a significant decline in attendance and loss of revenue.

103.    The excessive police activity described above occurred when Club Cinema would host a show or concert that appealed to a primarily African-American audience, such as hip hop and rap music events.

104.    Club Cinema has the right under the First Amendment to host hip hop and rap music events.

105.    The actions of the BSOC defendants described in the preceding paragraphs were taken to retaliate against Club Cinema for hosting events which catered to an African-American audience.

106.    The actions of the BSOC defendants described in the preceding paragraphs were taken because of the content of the speech being offered by Club Cinema, as no such actions were taken during events such as the Brazilian gospel concert.

107.    Sheriff Israel has admitted to making the decisions about policing at Club Cinema, even though this was the only time he has done so in his tenure as Sheriff.

108.    Sheriff Israel, as BSOC, is responsible for the conduct of the deputies of the Broward County Sheriff's Office.

109.    Sheriff Israel individually, and as the BSOC, specifically stated to those who worked for the BSOC, including Captain Milton Weiner, that he was going to shut down Club Cinema by any means and at any expense, and directed them to take whatever action was necessary to destroy Club Cinema's business and shut them down.

110.    Captain Weiner was the Captain in charge of the district in which the Subject Property and Club Cinema were located, and he had supervised the Club Cinema detail regularly before the excessive and unwarranted police activity began against Club Cinema in 2013, and was most familiar with Club Cinema's business and its operations.

111.    When Captain Weiner objected by stating that he was not going to cross the line and he would not do anything that was not authorized by law, he was fired from employment with the BSOC.

112.    The above-described actions, taken either directly by defendants the BSOC, Sheriff Israel individual or Captain Adkins were actions taken under color of state law.

113.    The BSOC had a policy, custom and/or practice of taking actions against plaintiff to deprive it of its constitutional rights.

114.    The BSOC officially sanctioned and/or ordered and/or carried out the unconstitutional actions against plaintiff set forth in Count I of this complaint.

115.    Sheriff Israel, as the final decision-maker of the BSOC, acquiesced in the practice of taking actions against plaintiff to deprive it of its constitutional

rights such that, since 2013, it became the BSOC'S standard operating procedure as to plaintiff.

116.    The BSOC ratified its policy, custom and/or practice of taking actions against plaintiff to deprive it of its constitutional rights by the fact that Sheriff Israel, as the one with final policy making authority for the BSOC, adopted the unconstitutional decisions of subordinate officers.

117.    As a matter of policy, custom and/or practice, the BSOC and Sheriff Israel individually and Captain Adkins ignored plaintiff's fundamental rights.

118.    The actions of the BSOC and Sheriff Israel individually and Captain Adkins in retaliating against plaintiff for exercising its First Amendment rights constitute a deliberate denial, under color of law, of plaintiff's federal rights guaranteed under the First Amendment to the United States Constitution, which is actionable under 42 U.S.C. §1983.

119.    Plaintiff has suffered injury as a result of the actions of the BSOC and Sheriff Israel individually and Captain Adkins.

WHEREFORE, plaintiff respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below, and enter a judgment in an amount to be determined by this Honorable Court and a jury, plus costs, interest and attorneys' fees.

**COUNT III**
**CLAIM FOR DEPRIVATION OF EQUAL PROTECTION RIGHTS**
**AGAINST DEFENDANTS THE CITY, BURRIE AND FISHER**

120.    Once Club Cinema refused to give the City a community center at Club Cinema's expense, Fisher and Burrie directed the BSOC to carry out, and

- 25 -

the BSOC did carry out, excessive and unwarranted policing activity at the Subject Property, designed to cause Club Cinema to go out of business.

121.    At the next event after Club Cinema communicated to the City that it refused to give the City a community center on the Subject Project at Club Cinema's expense, Club Cinema leased the venue to a promoter for a hip hop event for a weekend event.

122.    At that event, the BSOC, on its own and at the direction of the City and Commissioner Burrie, sent to the Subject Property a tactical team, helicopters and K-9 units with transportation vans (also known as paddy wagons).

123.    Cory Weisman, a manager at Club Cinema, approached the sergeant in charge of the operation to protest this action, and was told by the sergeant that he had been told by the Sheriff and Captain Adkins that this venue was going to be shut down by 2:00 a.m., or arrests would be made.

124.    Mr. Weisman contacted Captain Adkins, and advised him that the police presence was intimidating potential concertgoers, and that the officers were telling those seeking to enter the venue not to purchase tickets because the venue was going to be closed down, but the police activity did not cease.

125.    Beginning in 2013, and continuing through 2016, at the direction of the City, Mayor Fisher and/or Commissioner Burrie, intentionally directed the BSOC to engage in an official policy and a practice of excessive and unwarranted police activity at Club Cinema.

126.    On March 3, 2013, at the Excision show, there again was excessive and unwarranted police presence, with officers again telling potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

127.    On April 6, 2013, at the Crizzly concert, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

128.    On April 19, 2013, at the Electric Flurry show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

129.    On April 26, 2013, at the Flux Pavilion show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

130.    On May 11, 2013, at the hip hop Ace Hood show, the BSOC had over 50 officers present in SWAT gear.  This level of policing was designed to deter potential patrons, who were primarily black.  There were no more than 250 patrons at this show, a small fraction of the crowd which usually would patronize this show.

131.    A few days after the Ace Hood show, a BSOC sergeant approached a Club Cinema manager, and sarcastically asked how the show went.  The manager answered that, with all of the officers in tactical gear, the potential clientele was deterred from attending.  The sergeant replied, "I think that was the idea!"

132.    On May 18, 2013, at the May Daze show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

133.    On October 31, 2013, at the 4th Annual Tricks  or Beats event, a Halloween show featuring DJ Twinz Beatz, there were a large number of BSOC officers on the Subject Property.  Some of the officers were dressed in military tactical gear, including balaclavas (or ski masks), tactical vests and military-style uniforms.  There were also a large number of BSOC vehicles on the Subject Property, including several marked patrol cars, two unmarked SUVs, an unmarked sedan and a transportation van.  The police activity was excessive and

unwarranted (photographs of the police activity at Club Cinema on October 31, 2013 are attached hereto as Exhibit 1).

134.    On November 16, 2013, at a show featuring DJs Darude and Vaski, there were both marked and unmarked police cars, and at least six police officers dressed in riot uniforms, with one of the officers wearing a balaclava.

135.    On January 18, 2014, at a DJ Carnage show at the venue, there were between 25-30 BSOC officers on the Subject Property, and at least a dozen patrol cars with flashing lights.  Three patrol cars with flashing lights parked on the Subject Property directly in front of the entrance to the venue, and were later that evening joined by another four patrol cars with flashing lights, as well as a canine unit.

136.    A BSOC sergeant, Sergeant Craig Bachan, and five other BSOC officers came into the venue without invitation or a search warrant, and went to the stage where DJ Carnage was performing.  Sergeant Bachan took the microphone, told DJ Carnage to stop the music, and told the approximately 1,900 patrons that the venue was being closed down and that they had to leave immediately.  The BSOC officers herded all the patrons out of the building.

137.    On March 1, 2014, at the Excision show, there were eight to ten BSOC officers, in SWAT gear, were on the Subject Property directly in front of Club Cinema, as well as several BSOC SUVs (photographs showing the BSOC officers in SWAT gear are attached hereto as Exhibit 2).

138.   This list of dates and incidents is not an exhaustive list of the excessive and unwarranted police activity at the Subject Property, as that activity continued through 2016.

139.   The official policy and practice of excessive and unwarranted police activity at Club Cinema on the part of the City and the BSOC continued from 2013 through 2016, until Club Cinema was forced to cease shows because promoters, artists and patrons no longer wanted to appear at Club Cinema because of the excessive and unwarranted police activity.

140.   The intended result of the official policy and practice of the City and the BSOC of excessive and unwarranted police activity at Club Cinema, especially when the police activity included officers wearing SWAT or riot gear and ski masks, was done to intimidate and harass plaintiff, the patrons of Club Cinema and the artists and promoters who performed there.

141.   The City and/or Mayor Fisher and/or Commissioner Burrie directed the BSOC to carry out, and the BSOC did carry out, these police activity in such a manner as to create apprehension and fear in the potential patrons that a dangerous and high-profile crime scene was underway at the Subject Property.

142.   The false portrayal of a dangerous and high-profile crime scene at the Subject Property caused many potential patrons to decline to enter the Subject Property and/or venue, causing Club Cinema to experience a significant decline in attendance and loss of revenue.

143.   Cory Weisman and Steve Brown, managers of Club Cinema, met with then-Vice Mayor and Commissioner George Brummer to discuss the City's

demand that Club Cinema close on the weekends at 2:00 a.m.  Mr. Brummer directed Mr. Weisman and Mr. Brown to speak with Commissioner Burrie, because the Subject Property was in her district and she had a close relationship with Mayor Fisher and the BSOC, particularly Captain Adkins.

144.    Mr. Weisman and Mr. Brown met with Commissioner Burrie and explained to her that, under the provisions of the City's code, Club Cinema could operate until 4:00 a.m.  Commissioner Burrie did not dispute these facts with Mr. Weisman and Mr. Brown, but reiterated the demand that, if Club Cinema wanted to operate without excessive and unwarranted police activity, then Club Cinema had to close earlier than allowed by the City Code and had to donate a portion of the Subject Property for a community center named after Commissioner Burrie.

145.    Mr. Weisman and Mr. Brown made repeated trips to City Hall to speak to City representatives regarding the excessive and unreasonable and unwarranted police activity by the BSOC at the Subject Property.  In these conversations, Mr. Weisman and Mr. Brown were told to focus on Mayor Fisher and Commissioner Burrie, because they were the decision-makers directing that the BSOC carry out the police activity at the Subject Property, and that while the Commissioners were aware of the activity, they would take no action to stop it.

146.    Mr. Weisman and Mr. Brown made several attempts to meet with Mayor Fisher, but he never was available when they tried to set up meetings or when they called him, and they never received any return telephone calls.

147.    Mr. Weisman and Mr. Brown finally went to Mayor Fisher's place of business, Fisher Auction House, where Mayor Fisher was in and unable to avoid

speaking with Mr. Weisman and Mr. Brown.  Mayor Fisher advised Mr. Weisman

and Mr. Brown that Captain Adkins was his longtime personal friend, and that

Mayor Fisher was not only aware of the actions of the BSOC and Captain

Adkins, but was directing them as well.

148.   Mayor Fisher advised Mr. Weisman and Mr. Brown that the

demand that Club Cinema close down before the time permitted by City Code

had nothing to do with Club Cinema or how it conducted its business.

149.   Instead, Mayor Fisher said the City viewed Club Cinema in the

same light as the adult entertainment establishments in the City (despite the fact

that the entertainment offered at Club Cinema was not "adult entertainment" or

sexually oriented).  The demand that Club Cinema close earlier than required by

the City Code was made so that the City Commissioners could remain popular

with the voting population in the City.

150.   Mayor Fisher told Mr. Weisman and Mr. Brown that he was aware

of the cultural importance and national visibility of the venue, and that several

weeks earlier he had attended a Brazilian gospel event at Club Cinema, which

did not have excessive police activity.  Nevertheless, he was adamant that Club

Cinema would continue to be targeted with excessive police activity until the

venue agreed to close early.

151.   Mr. Weisman documented all of these events set forth in the

preceding paragraphs in a letter which he sent on June 13, 2013 to Robert

Pereira, who was the campaign fundraiser for Sheriff Israel and who was

appointed to the Board of Advisors for the County.  Mr. Weisman never received a response to his letter from Mr. Pereira or anyone else.

152.   After meeting with Mayor Fisher, Mr. Frontera, Mr. Weisman and Mr. Brown met with Commissioner Burrie to ask that the excessive and unwarranted police activity stop.

153.   During that meeting, Mr. Frontera said that there was an upcoming mayoral election, and that he and other members of management would have to support a different candidate if the wrongful, harassing activity did not stop.

154.   Commissioner Burrie then jumped out of her chair and vehemently said, "You will never beat Lamar, no matter who you decide to support." Commissioner Burrie began speaking angrily, stating that no one would oppose her lifelong friend, Mayor Fisher, whom she had bounced on her knee when he was young.  Commissioner Burrie told Mr. Frontera, Mr. Weisman and Mr. Brown that she was furious that they had not done what she wanted as to the community center and with the indication that they would not be supporting Mayor Fisher for re-election and said that the excessive police activity would not stop until Club Cinema was finally out of business.

155.   At some time after this meeting had concluded, Mr. Brown happened to be in the same place as Commissioner Burrie, and so again raised that the excessive police activity needed to cease.  Commissioner Burrie said to Mr. Brown, "Oh yeah, well, guess what?  That's not gonna stop until we finally put the club out of business."

156.    Throughout all the relevant times in this complaint, Club Cinema had no code violations or citations or other infractions, and was never cited for anything, despite the excessive police presence.

157.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of City Attorney Mark Berman, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: City Attorney, Mark Berman, Esq. from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 3).

158.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of City Attorney Gordon B. Linn, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: City Attorney, Gordon B. Linn, Esq. from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 4).

159.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of City Manager Dennis W. Beach, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: City Manager, Dennis W. Beach, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 5).

160.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of Mayor Lamar Fisher, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of

the letter to the City of Pompano Beach, attention: Mayor Lamar Fisher, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 6).

161.    On November 6, 2013, counsel for plaintiff sent a letter to the City, directed to the attention of Vice-Mayor George Brummer, setting forth some of the wrongful actions taken against Club Cinema by the City and the BSOC (a copy of the letter to the City of Pompano Beach, attention: Vice-Mayor George Brummer, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 7).

162.    As set forth in the November 6, 2013 letters to the City, Club Cinema demanded that the harassment of it stop, specifically referring to the fact that the City directed the BSOC, and the BSOC carried out, police details at Club Cinema which significantly impaired Club Cinema's ability to conduct business. These police details included the presence of at least five to six police cars, fire trucks, officers in tactical gear, officers in ski masks and officers themselves bringing illegal drugs onto the premises of Club Cinema (Exhibits 3-7).

163.    In the November 6, 2013 letters to the City, Club Cinema advised the City that it was aware that the City had directed the BSOC, and the BSOC carried out, warrantless entries into Club Cinema's building by entering the building after purchasing a ticket which was intended for the club patrons only, and demanded that such warrantless entries cease (Exhibits 3-7).

164.    These unwarranted and wrongful tickets and charges and the targeting of plaintiff's patrons for selective and vindictive enforcement were part of an official policy, custom or practice of the City and Mayor Fisher and

Commissioner Burrie to wrongfully harass plaintiff and cause Club Cinema to close down.

165.    The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Pompano Beach Amphitheatre, which is a similarly-situated concert venue in the municipality, and did not target the patrons of Pompano Beach Amphitheatre for selective and vindictive enforcement.

166.    The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Swinging Richards, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Swinging Richards for selective and vindictive enforcement.

167.    The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Culture Room, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Culture Room for selective and vindictive enforcement.

168.    The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Kingshead Pub Pompano Beach, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Kingshead Pub Pompano Beach for selective and vindictive enforcement.

169.    The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Body Shop Night Club,

which is a similarly-situated nightclub in the municipality, and did not target the patrons of Body Shop Night Club for selective and vindictive enforcement.

170.   The City and Mayor Fisher and Commissioner Burrie did not direct the BSOC to issue similar tickets and charges against Tropicante Night Club, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Tropicante Night Club for selective and vindictive enforcement.

171.   The City, Mayor Fisher and Commissioner Burrie viewed Club Cinema as being similarly-situated to adult entertainment venues in the City.

172.   The City, Mayor Fisher and Commissioner Burrie have treated plaintiff differently than the adult entertainment venues in the City, which are Cheetah, Diamond Dolls, Club Pink, Booby Trap and Flavors, and targeted plaintiff for selective enforcement, to plaintiff's detriment.

173.   The City, Mayor Fisher and Commissioner Burrie have treated plaintiff differently than the Isle Casino, of which the City is part owner, as the City permits the Isle Casino to remain open and serve alcoholic beverages 24 hours a day.

174.   By treating plaintiff differently than similarly-situated entities to plaintiff's detriment, the City, Mayor Fisher and Commissioner Burrie have violated plaintiff's right to equal protection of the law, as guaranteed under the Fourteenth Amendment of the United States Constitution.

175.   The actions of the City, Mayor Fisher and Commissioner Burrie constituted a deliberate denial, under color of law, of plaintiff's federal rights

guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. §1983.

176.   The actions of the City, Mayor Fisher and Commissioner Burrie were actions taken under color of state law.

177.   The actions of the City, Mayor Fisher and Commissioner Burrie have caused plaintiff to suffer injury and economic loss, among other damages.

178.   The actions of the City, Mayor Fisher and Commissioner Burrie have had a negative impact on plaintiff's goodwill and reputation, and defendants have made it impossible for plaintiff to operate at the Subject Property.

WHEREFORE, plaintiff respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below, and enter a judgment in an amount to be determined by this Honorable Court and a jury, plus costs, interest and attorneys' fees.

**COUNT IV**
**CLAIM FOR DEPRIVATION OF EQUAL PROTECTION**
**RIGHTS AGAINST DEFENDANTS SHERIFF SCOTT ISRAEL IN**
**HIS OFFICIAL CAPACITY, SHERIFF SCOTT ISRAEL**
**IN HIS INDIVIDUAL CAPACITY AND CAPTAIN WAYNE ADKINS**

179.   Beginning in 2013, and continuing through 2016, the BSOC intentionally engaged in an official policy and a practice of excessive and unwarranted police activity at Club Cinema.

180.   The BSOC sent to the Subject Property on numerous occasions a tactical team, helicopters and K-9 units with transportation vans (also known as paddy wagons).

181.    Cory Weisman, a manager at Club Cinema, approached the sergeant in charge of the operation to protest these actions, and was told by the sergeant that he had been told by the Sheriff and Captain Adkins that this venue was going to be shut down by 2:00 a.m., or arrests would be made.

182.    Mr. Weisman contacted Captain Adkins, and advised him that the police presence was intimidating potential concertgoers, and that the officers were telling those seeking to enter the venue not to purchase tickets because the venue was going to be closed down, but the police activity did not cease.

183.    On March 3, 2013, at the Excision show, there again was excessive and unwarranted police presence, with officers again telling potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

184.    On April 6, 2013, at the Crizzly concert, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

185.    On April 19, 2013, at the Electric Flurry show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed

down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

186.    On April 26, 2013, at the Flux Pavilion show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

187.    On May 11, 2013, at the hip hop Ace Hood show, the BSOC had over 50 officers present in SWAT gear.  This level of policing was designed to deter potential patrons, who were primarily black.  There were no more than 250 patrons at this show, a small fraction of the crowd which usually would patronize this show.

188.    A few days after the Ace Hood show, a BSOC sergeant approached a Club Cinema manager, and sarcastically asked how the show went.  The manager answered that, with all of the officers in tactical gear, the potential clientele was deterred from attending.  The sergeant replied, "I think that was the idea!"

189.    On May 18, 2013, at the May Daze show, there again was excessive and unwarranted police presence, with an even larger amount of officers and patrol cars than previous shows.  The officers again told potential concertgoers not to attend the event and that the venue was going to be closed

down, causing a significant drop in concertgoers and a financial loss to Club Cinema.

190.    On October 31, 2013, at the 4th Annual Tricks or Beats event, a Halloween show featuring DJ Twinz Beatz, there were a large number of BSOC officers on the Subject Property.  Some of the officers were dressed in military tactical gear, including balaclavas (or ski masks), tactical vests and military-style uniforms.  There were also a large number of BSOC vehicles on the Subject Property, including several marked patrol cars, two unmarked SUVs, an unmarked sedan and a transportation van.  The police activity was excessive and unwarranted (photographs of the police activity at Club Cinema on October 31, 2013 are attached hereto as Exhibit 1).

191.    On November 16, 2013, at a show featuring DJs Darude and Vaski, there were both marked and unmarked police cars, and at least six police officers dressed in riot uniforms, with one of the officers wearing a balaclava.

192.    On January 18, 2014, at a DJ Carnage show at the venue, there were between 25-30 BSOC officers on the Subject Property, and at least a dozen patrol cars with flashing lights.  Three patrol cars with flashing lights parked on the Subject Property directly in front of the entrance to the venue, and were later that evening joined by another four patrol cars with flashing lights, as well as a canine unit.

193.    A BSOC sergeant, Sergeant Craig Bachan, and five other BSOC officers came into the venue without invitation or a search warrant, and went to the stage where DJ Carnage was performing.  Sergeant Bachan took the

microphone, told DJ Carnage to stop the music, and told the approximately 1,900 patrons that the venue was being closed down and that they had to leave immediately.  The BSOC officers herded all the patrons out of the building.

194.   On March 1, 2014, at the Excision show, there were eight to ten BSOC officers, in SWAT gear, were on the Subject Property directly in front of Club Cinema, as well as several BSOC SUVs (photographs showing the BSOC officers in SWAT gear are attached hereto as Exhibit 2).

195.   This list of dates and incidents is not an exhaustive list of the excessive and unwarranted police activity at the Subject Property, as that activity continued through 2016.

196.   The official policy and practice of excessive and unwarranted police activity at Club Cinema on the part of the BSOC continued from 2013 through 2016, until Club Cinema was forced to cease shows because promoters, artists and patrons no longer wanted to appear at Club Cinema because of the excessive and unwarranted police activity.

197.   On November 6, 2013, counsel for plaintiff sent a letter to the BSOC, directed to the attention of Sheriff Israel, setting forth some of the wrongful actions taken against Club Cinema by the BSOC (a copy of the letter to the Public Safety Building, attention: Sheriff of Broward County, Scott Israel, from Sanford R. Topkin, November 6, 2013, is attached hereto as Exhibit 9).

198.   As set forth in the November 6, 2013 letters to the BSOC, Club Cinema demanded that the harassment of it stop, specifically referring to the fact that the BSOC carried out police details at Club Cinema which significantly

impaired Club Cinema's ability to conduct business.  These police details included the presence of at least five to six police cars, fire trucks, officers in tactical gear, officers in ski masks and officers themselves bringing illegal drugs onto the premises of Club Cinema (Exhibit 9).

199.    In the November 6, 2013 letters to the BSOC, Club Cinema advised the BSOC that it had carried out warrantless entries into Club Cinema's building by entering the building after purchasing a ticket which was intended for the club patrons only, and demanded that such warrantless entries cease (Exhibit 9).

200.    In response to the letter, the BSOC did not cease or desist from trespassing, but instead, as certain BSOC officers have admitted under oath, they began to bribe people to let them into Club Cinema secretly, paying as much as $60 per officer, and used threats to the door security, so that they could enter the club without warrants and without having to purchase tickets.

201.    In addition to the excessive and unwarranted police activity, the BSOC interfered with Club Cinema's shows and shut them down before the close of business, without provocation or justification, solely to destroy Club Cinema's business, reputation and ability to attract paying customers to future shows and artists to perform at future shows.

202.    As part of their plan to destroy Club Cinema's business and reputation and shut down the venue, the BSOC, Sheriff Israel individually, Captain Adkins targeted plaintiff, the Subject Property and its patrons for inspections; unwarranted questioning, stopping and detaining of patrons; selective ticketing of patrons; and other such actions.

203.    This excessive and unwarranted police scrutiny of plaintiff, the Subject Property and its patrons caused patrons and potential patrons not to patronize the venue, causing financial hardship and detriment to plaintiff.

204.    These unwarranted and wrongful tickets and charges were an abuse of the BSOC's power and authority.

205.    The false portrayal of a dangerous and high-profile crime scene at the Subject Property caused many potential patrons to decline to enter the Subject Property and/or venue, causing Club Cinema to experience a significant decline in attendance and loss of revenue.

206.    These unwarranted and wrongful tickets and charges and the targeting of plaintiff's patrons for selective and vindictive enforcement were part of an official policy, custom or practice to wrongfully harass plaintiff and cause Club Cinema to close down.

207.    The BSOC, Sheriff Israel and Captain Adkins did not issue similar tickets and charges against Pompano Beach Amphitheatre, which is a similarly-situated concert venue in the municipality, and did not target the patrons of Pompano Beach Amphitheatre for selective and vindictive enforcement.

208.    The BSOC, Sheriff Israel and Captain Adkins did not issue similar tickets and charges against Swinging Richards, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Swinging Richards for selective and vindictive enforcement.

209.    The BSOC, Sheriff Israel and Captain Adkins did not issue similar tickets and charges against Culture Room, which is a similarly-situated nightclub

in the municipality, and did not target the patrons of Culture Room for selective and vindictive enforcement.

210.    The BSOC, Sheriff Israel and Captain Adkins did not did not direct the BSOC to issue similar tickets and charges against Kingshead Pub Pompano Beach, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Kingshead Pub Pompano Beach for selective and vindictive enforcement.

211.    The BSOC, Sheriff Israel and Captain Adkins did not issue similar tickets and charges against Body Shop Night Club, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Body Shop Night Club for selective and vindictive enforcement.

212.    The BSOC, Sheriff Israel and Captain Adkins did not issue similar tickets and charges against Tropicante Night Club, which is a similarly-situated nightclub in the municipality, and did not target the patrons of Tropicante Night Club for selective and vindictive enforcement.

213.    The BSOC, Sheriff Israel and Captain Adkins viewed Club Cinema as being similarly-situated to adult entertainment venues in the City.

214.    The BSOC, Sheriff Israel and Captain Adkins have treated plaintiff differently than the adult entertainment venues in the City, which are Cheetah, Diamond Dolls, Club Pink, Booby Trap and Flavors, and targeted plaintiff for selective enforcement, to plaintiff's detriment.

215.    By treating plaintiff differently than similarly-situated entities to plaintiff's detriment, the BSOC, Sheriff Israel and Captain Adkins have violated

plaintiff's right to equal protection of the law, as guaranteed under the Fourteenth Amendment of the United States Constitution.

216.    The actions of the BSOC, Sheriff Israel and Captain Adkins constituted a deliberate denial, under color of law, of plaintiff's federal rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. §1983.

217.    The actions of the BSOC, Sheriff Israel and Captain Adkins were actions taken under color of state law.

218.    The actions of the BSOC, Sheriff Israel and Captain Adkins have caused plaintiff to suffer injury and economic loss, among other damages.

219.    The actions of the BSOC, Sheriff Israel and Captain Adkins have had a negative impact on plaintiff's goodwill and reputation, and defendants have made it impossible for plaintiff to operate at the Subject Property.

WHEREFORE, plaintiff respectfully request that this Honorable Court enter an order granting the relief requested in the Request for Relief below, and enter a judgment in an amount to be determined by this Honorable Court and a jury, plus costs, interest and attorneys' fees.

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Honorable Court enter a judgment against defendants in an amount to be determined by this Honorable Court and a jury, plus costs, interest, exemplary damages, and attorneys' fees, and that this Honorable Court enter an order that:

A.      Awards plaintiff, pursuant to 42 U.S.C. §1988, its costs, attorney fees, interest, lost profits, and all other actual, compensatory, incidental, consequential, emotional and exemplary damages against defendants; and

B.      Awards any other and further relief to plaintiff as this Court deems just and proper.


Respectfully submitted,


  /s/ Sanford R. Topkin
Sanford R. Topkin (FBN: 948070)
stopkin@topkinlaw.com
Topkin & Partlo, P.L.
1166 W. Newport Center Drive, Suite 309
Deerfield Beach, Florida  33442
Telephone:  (954) 422-8422
Facsimile:  (954) 422-5455

Dated:  November 9, 2018          Attorneys for Plaintiff

## **DEMAND FOR JURY**

Plaintiff USA ENTERTAINMENT GROUP, INC. d/b/a CLUB CINEMA, by

its attorneys, hereby demand a trial by jury on its causes of action against

defendants SHERIFF SCOTT ISRAEL IN HIS OFFICIAL CAPACITY; SHERIFF

SCOTT ISRAEL, individually; CAPTAIN WAYNE ADKINS; THE CITY OF

POMPANO BEACH, FLORIDA; LAMAR FISHER, in his individual capacity; and

CHARLOTTE BURRIE, in her individual capacity, jointly and severally.

/s/ Sanford R. Topkin
Sanford R. Topkin (FBN: 948070)
stopkin@topkinlaw.com
Topkin & Partlo, P.L.
1166 W. Newport Center Drive, Suite 309
Deerfield Beach, Florida  33442
Telephone:  (954) 422-8422
Facsimile:  (954) 422-5455

Dated:  November 9, 2018          Attorneys for Plaintiff