UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 18-CV-62740-UU

USA ENTERTAINMENT GROUP, INC.,
a Florida corporation d/b/a CLUB CINEMA,

        Plaintiffs,

vs.

SHERIFF GREGORY TONY, In His Official Capacity;
SHERIFF SCOTT ISRAEL, Individually;
MAJOR WAYNE ADKINS;
THE CITY OF POMPANO BEACH,
a Florida municipal corporation;
LAMAR FISHER, individually and in his official capacity;
And CHARLOTTE BURRIE, individually and in her
official capacity; jointly and severally,

        Defendants.

_____/

## DEFENDANTS, SHERIFF GREGORY TONY, SHERIFF SCOTT ISRAEL, AND MAJOR WAYNE ADKINS'S, MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, SHERIFF GREGORY TONY ("BROWARD SHERIFF'S OFFICE" or "BSO"), in his official capacity, SHERIFF SCOTT ISRAEL ("ISRAEL"), individually, and MAJOR WAYNE ADKINS ("ADKINS"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rules of the Southern District of Florida 7.1 and 56.1, hereby file their Motion for Summary Judgment and memorandum of law in support thereof, and state as follows:

### I.     STATEMENT OF THE CASE

Plaintiff claims two bases for the imposition of 42 USC §1983 liability upon BSO, Adkins, and Israel, in his individual capacity. Plaintiff alleges that these Defendants 1) retaliated against the Plaintiff's First Amendment freedom of speech (Count II), and 2) deprived the Plaintiff of equal protection under the 14th Amendment (Count IV). As discussed below, the Plaintiff has failed to make a *prima facie* argument for either claim as there is a complete lack of

1

record evidence to support either of the Plaintiff's claims. As such, this Court should summarily dismiss Counts II and IV.

## II.     LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.

## III.    FIRST AMENDMENT RETALIATION

In order to successfully bring a First Amendment claim under Section 1983, a plaintiff must establish three elements: (i) that the plaintiff's speech was constitutionally protected, (ii) that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, and (iii) that a causal relationship exists between its speech and the defendant's retaliatory action. *See O'Bryant v. Finch,* 637 F.3d 1207, 1212 (11th Cir.2011); *Boyd v. Peet,* 249 Fed. Appx 155 (11th Cir. 2007); *Bennett v. Hendrix,* 423 F.3d 1247, 1250, 1254 (11th Cir.2005).

### A.  The Plaintiff has not engaged in protected speech

First, the Plaintiff has failed to establish that it engaged in protected speech. Plaintiff merely makes the inference that the alleged the Defendants' "excessive police activity" occurred when the Plaintiff would "host a show or concert that appealed to a primarily African-American audience, such as hip hop and rap music events." [ECF 67 at ¶ 130]. The Plaintiff alleges further that it "has the right under the First Amendment to host hip hop and rap music events," and the actions of BSO "were taken to retaliate against [the Plaintiff] for hosting events which catered to African American audience[1] [ECF 67 at ¶¶ 131-132].

Generally, "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). Nevertheless, *hosting* a music event has not been considered protected speech. *See Habash v. City of Salisbury, Md.,* 618 F. Supp.2d 434 (D. Md. 2009) (No case supporting the proposition that the playing of hip hop music constitutes protected speech). In the concert setting, the First Amendment right to freedom of expression interacts with the right to freedom of

---

[1] The Plaintiff's allegation appears to infer that rap and hip hop music appeals primarily to African American audiences. [*See* ECF 67 at ¶¶ 130-132]. This is itself a proposition with racial, stereotypical undertones. Notwithstanding, the Plaintiff has not presented any record evidence to establish the audience size or the racial makeup of its patrons.

assembly and association. "Implicit in the right to engage in First Amendment-protected activities is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir.2004) (quoting *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622 (1984)). The right, which protects expressive association, however, does not protect chance encounters at a dance club that contain no element of expression. *See City of Dallas v. Stanglin,* 490 U.S. 19, 25 (1989); *Roberts,* 468 U.S. at 619. In the case at bar, the Plaintiff was not engaging in any speech. However, even if we assume the Plaintiff has alleged that the Defendants interfered with the right of their patrons to associate within its business, then Plaintiff has also failed to allege a protected right. *See Stanglin,* 490 U.S. at 25.

### B. The government may impose reasonable restrictions on the time, place, or manner of protected speech

Next, even assuming arguendo that hosting a hip hop or rap event constitutes a protected form of speech, even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 791 (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981)).

### i.    The alleged acts of the Defendants were content neutral

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward*, 491 U.S. at 791 (citing *Clark,* 468 U.S. at 295). The government's purpose is the controlling consideration. *Id.* at 792 (citing *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48 (1986). Government regulation of expressive activity is content neutral so long as it is "*justified* without reference to the content of the regulated speech." *Id.* at 792 (quoting *Clark,* 468 U.S. at 293) (emphasis added).

The Plaintiff has asserted that the Defendants alleged actions were taken "*solely* to destroy [the Plaintiff]'s business, reputation and ability to attract paying customers to future

3

shows and artists to perform at future shows." (emphasis added) [ECF 67 at ¶ 125]. By the Plaintiff's own allegations, it does not appear that the Defendants took any action to actually regulate the speech of the Plaintiff or its musical acts because of a disagreement with the message it conveys. *See id.* at 791. Taking the allegations of the Plaintiff as true, only for the purposes of this argument, it appears the Defendants' alleged actions were unrelated to the content of expression.   As such the Defendants' alleged actions should be deemed content neutral, and, therefore, reasonable under the circumstances. *See id.* at 792.

> ii.     **Defendants' alleged acts were narrowly tailored to serve a significant governmental interest**

Despite the Plaintiff's allegation to the contrary, the true reason for the presence of law enforcement near the Plaintiff's business was "narrowly tailored to serve a significant governmental interest." *See id.* at 796 (quoting *Clark,* 468 U.S. at 293). The Defendants were present at the Plaintiff's property in order to assure the public safety of the Plaintiff's patrons on concert nights. *See Orgain v. City of Salisbury, Md.*, 305 Fed. Appx. 90, 101 (4th Cir. 2008) (holding that Salisbury officials were acting out of a "genuine concern for public safety"). The Plaintiff's building has a capacity of approximately 2,500 people. *See* Statement of Facts ("SOF") at ¶ 20. "Public safety is always a serious concern during an event at a venue of this size." *Id*. Notably, the Plaintiff and "the immediate surrounding area had a history of emergency calls for suspected criminal activity and or public safety/medical emergencies, including felonies, narcotics violations, overdoses, larceny, robbery, assault. *See* SOF at ¶ 19. "Broward Sheriff's Office would assign officers to Club Cinema during an event to maintain public safety." *See* SOF at ¶ 20. Importantly**, "**Broward Sheriff's Office would assign officers to Club Cinema without concern to the type of musical act (rap, hip-hop, EDM, Latin, gospel, etc.) as maintaining public safety for a venue of this size is of *primary* importance." *See* SOF at ¶ 21 (emphasis added). The Plaintiff does not have record evidence to dispute BSO's legitimate purpose for being at the Plaintiff's property. Based on the foregoing it is clear that the Defendant's actions were narrowly tailored to serve a significant governmental interest, and, therefore, reasonable under the circumstances. *Ward*, 491 U.S. at 791.

> iii.     **The Defendants left open ample alternative channels of communication**

The final requirement, that the Defendants leave open ample alternative channels of communication, is easily met. Indeed, in this respect the Defendants actions were far less restrictive than regulations courts have upheld in other cases, for it does not attempt to ban any particular manner or type of expression at a given place or time. Cf. *Frisby v. Schultz, 487 U.S. 474, 482–484 (1988)*; *Clark,* 468 U.S., at 295; *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 53–54 (1986). Rather, the Defendants alleged actions continued to permit expressive activity at the Plaintiff's property and had no effect on content of that expression as there is no evidence that any shows were shut down. *See* SOF at ¶¶ 24-25. That the Defendants actions may have "reduced to some degree the potential audience for [the Plaintiff's] speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate." *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, at 803 and n. 23, 812 and n. 30 (1984); *Kovacs v. Cooper*, 336 U.S. 77, 88-89 (1949). Based on the foregoing it is clear that the Defendant's actions allowed ample alternative channels of communication, and, therefore, reasonable under the circumstances. *Ward*, 491 U.S. at 791.

### C. Plaintiff has failed to provide any record evidence of actual adverse retaliatory action taken against it

Even if the Plaintiff's musical format could be construed as protected speech, the Plaintiff's claim must fail. To find a violation of First Amendment rights in a retaliation context, the Eleventh Circuit has held "[a] Plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Taylor v. City of Atlanta Police Dept.*, 2006 WL 304038, at *11 (S.D. Fla. Feb. 7, 2006) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)). Implicit in such requirement is that a First Amendment retaliation claim cannot be sustained without the presence and occurrence of an *actual adverse action* taken by a defendant and targeted against a plaintiff. *See Bethel v. Town of Loxley*, 221 Fed. App'x. 812, 813 (11th Cir. 2006). The Eleventh Circuit has further recognized that there can be no liability when a plaintiff is simply "unreasonably weak-willed . . . ." *Bennett*, 423 F.3d at 1252. The opinion of *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) is instructive in this regard.

In *Club Retro, L.L.C. v. Hilton*, the Plaintiff, a nightclub, alleged two acts by law enforcement that purportedly infringed their First Amendment rights. 568 F.3d at 211–12. First, on the night a raid, "some of the Deputy Sheriffs were telling people that Club Retro, L.L.C. was

going to be shut down, that people should not come back to Club Retro, L.L.C. and that, if they did come back to Club Retro, L.L.C., that Club Retro, L.L.C. would be raided again and they would be arrested." *Id.* Second, the following weekend, on the night of a concert at Club Retro, a fire marshal and two deputy sheriffs entered Club Retro and stayed until the show began. Two other deputy sheriffs conspicuously parked their cruisers in Club Retro's parking lot for the duration of the concert. *Id.* The Court upheld the lower court's dismissal and concluded that the plaintiff failed to plead a constitutional infringement. *Id.* "Statements by some deputy sheriffs that people should not return to the club do not constitute a prior restraint on any First Amendment rights." *Id.* The Court reasoned that plaintiff was free to and did hold its concert, moreover, Club Retro continued to operate without government officials exercising any control over their speech. *Id.* The Court highlighted that the plaintiff's "[p]atrons were free to and did attend." *Id.* Additionally, the Court also determined that "the passive attendance and visibility of the deputy sheriffs at Club Retro before and during the a concert was not a violation of First Amendment rights" as the law enforcement officers had every right to attend the show and park in the parking lot just as any other patron. *Id.* (citing *Lewis v. United States*, 385 U.S. 206, 211 (1966). Similar to the facts in the opinion of *Club Retro*, in the case at bar, the Defendants presence at the Plaintiff's property would not be considered an adverse retaliatory action taken against the Plaintiff.

The Eleventh Circuit has also analyzed cases in which it was determined the actions of the defendants constituted an "adverse action or effect" for purposes of First Amendment retaliation claims. *Id*. at 1254-54. In *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003), evidence showed that the municipality "engaged the punitive machinery of government in order to punish [plaintiff] for speaking out" when record evidence showed repeated targeted ticketing of the plaintiff for illegally parking her vehicle. *Id*. at 729. In *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002), record evidence showed "two disturbing incidents involving undercurrent of violence" wherein two reserve deputy constables were retaliated against when they reported unlawful practices undertaken by other reserve deputy constables. In one retaliatory incident, one of the plaintiffs was pulled over as part of a routine traffic stop by several officers and constables, with guns drawn, for an inordinate amount of time. The result of the traffic stop was the issuance of a minor traffic citation. In *Bloch v. Ribar*, 156 F.3d 673, 680-81 (6th Cir. 1988), in response to plaintiff's public criticisms of a police department's handling of

her case, the police department's sheriff released confidential and humiliating details of plaintiff's rape during a press conference.

The actions of the defendants in the above-referenced cases were clear examples of adverse acts actually taken against, and targeted toward, the plaintiffs as a result of their actions. Such are clear instances of direct retaliatory acts. Unlike the above-referenced cases, the Plaintiff in the present matter fails to support a First Amendment retaliation claim. Plaintiff presents no record evidence supporting that the BSO took adverse action against it in any way. The most Plaintiff alleges is BSO assigned an "excessive and unwarranted police presence" at the events it held [ECF 67 at ¶¶ 87-123]. However, the Plaintiff has failed to provide record evidence of any police action at these events, such as actually shutting down the Plaintiff's club or stopping the music artists from performing. Indeed, the Plaintiff alleges that BSO officers told patrons "the venue was *going* to be closed down," and the Plaintiff failed to provide record evidence that its events were actually shut down. (emphasis added) [ECF 67 at ¶¶ 87-123].

The Plaintiff's alleged action by BSO is a far cry from the "tit-for-tat" adverse actions illustrated in the above-referenced cases. *See Laird v. Tatum*, 408 U.S. 1, 2 (1972) (holding plaintiff failed to provide a justiciable controversy under the First Amendment where plaintiffs complained of no specific adverse action against them). Moreover, the alleged conduct of the Defendants is "insufficient under the circumstances to 'deter a person of ordinary firmness' from engaging in the protected speech." *Indigo Room, Inc. v. City of Fort Myers*, 589 Fed. Appx. 938, 947 (11th Cir. 2014) (quoting *O'Bryant*, 637 F.3d at 1212). As such, the Plaintiff has failed to offer up any evidence to satisfy the implicit requirement that an occurrence of *actual* adverse action taken by BSO and targeted against the Plaintiff. *See Bethel*, 221 Fed. App'x. at 813. Therefore, this Court should dismiss the Plaintiff's First Amendment retaliation claim.

### D. Plaintiff has failed to provide any record evidence that a causal relationship exists between its speech and the Defendants' alleged retaliatory action

The Plaintiff also bears the burden of proving that a causal relationship exists between its speech and the Defendants' allegedly retaliatory actions. *See Boyd,* 249 Fed. Appx 155. "The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech." *Indigo Room*, 589 Fed. Appx. at 947 (citing *O'Bryant,* 637 F.3d at 1217)). The Plaintiff alleges that the actions of BSO were taken "because of the content of the speech being offered by [the Plaintiff], as no such actions were taken during

events such as the Brazilian gospel concert." [ECF 67 at ¶ 133]. However, the Plaintiff contradicts this assertion in other allegations of the Amended Complaint by stating that BSO had "excessive or unwarranted police presence" at twenty events that were not related to hip hop or rap. For example, Plaintiff alleges that BSO had "excessive or unwarranted police presence" at the following events:

- Excision, a known Canadian producer and DJ of electronic dance music or "dubstep." [*See* ECF 67 ¶¶ 87, 97, 99];
- Zed True Colors show, a known Russian-German electronic music producer [*See* ECF 67 ¶ 91];
- DJ Carnage, a known electronic dance music DJ [*See* ECF 67 ¶ 92];
- Oliver Heldens, a known Dutch DJ and producer of electronic-dance music. [*See* ECF 67 ¶ 93];
- Borgore, a known Israeli electronic dance music producer, DJ, and singer-songwriter. [*See* ECF 67 ¶¶ 95, 107];
- DVBBS, a Canadian electronic dance music duo. [*See* ECF 67 ¶¶ 98, 104];
- Lenardo & Eduardo Costa, a known Brazilian country music duo. [*See* ECF 67 ¶ 106];
- DJ Jauz, a known American DJ and electronic dance music producer [*See* ECF 67 ¶ 110];
- Adventure Club, is a known Canadian electronic dance music duo [*See* ECF 67 ¶ 111];
- Wesley Safadão, a known Brazilian singer, songwriter, and producer [*See* ECF 67 ¶ 112];
- Henrique e Juliano, a known Brazilian music duo. [*See* ECF 67 ¶ 113];
- RL Grime and Bonnie X Clyde, two known electronic dance groups. [*See* ECF 67 ¶ 115];
- DJ Datsik, a known Canadian electronic dance music DJ. [*See* ECF 67 ¶ 117];
- Dion Timmer, a known Dutch electronic music producer [*See* ECF 67 ¶ 118];
- La Dinastía show, a known Mexican ranchero band. [*See* ECF 67 ¶ 119];
- Los Tucanes de Tijuana, a known Mexican norteño band. [*See* ECF 67 ¶ 122].

The Amended Complaint did not identify the music artist or genre for the following events: Trick or Beats; May Daze; Night of the Rising Stars; Halloween Adventure; Back to Broward; St. Patty's Day Bash. [ECF 67 ¶¶ 94, 103, 105, 114, 116, 120]. Notwithstanding, of the thirty-five musical acts highlighted in the Plaintiff's Amended Complaint, only nine feature known rap and/or hip hop music artists. [ECF 67 ¶¶ 89, 90, 96, 101, 102, 108, 109, 121, 123]. As such, if we consider the nine out of thirty-five artists that are known rap or hip hop artists, approximately

26% of the Plaintiff's musical acts featured rap and/or hip hop. Notably, the Amended Complaint only *specifically* identifies four music acts as "rap show[s]." [ECF 67 ¶¶ 102, 108, 109, 121]. If we only consider the four out of thirty-five artists that are specifically identified as rap or hip hop artists within the Amended Complaint, approximately 11% of the Plaintiff's musical acts featured rap and/or hip hop.

From the above analysis of the events hosted by the Plaintiff, it is apparent that BSO did not assign law enforcement personnel based on the genre of music. Moreover, the record evidence is insufficient to support an inference that the Plaintiff's protected activity was a motivating factor behind the citation. Therefore, no reasonable jury could conclude that the Defendants were subjectively motivated to retaliate against the Plaintiff's protected speech. *Indigo Room*, 589 Fed. Appx. at 947 (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799–800 (11th Cir. 2000)).

In addition, the Plaintiff's own allegations discussing each event held at its business establish that the Plaintiff held events catering to a multitude of music genres and BSO policed the area without regard to the type of music performed at the Plaintiff's establishment. [ECF 67 at ¶¶ 87-123]. Further, "Broward Sheriff's Office would assign officers to Club Cinema during an event to maintain public safety. Broward Sheriff's Office would assign officers to Club Cinema without concern to the type of musical act (rap, hip-hop, EDM, Latin, gospel, etc.) as maintaining public safety for a venue of this size is of primary importance." *See* SOF at ¶ 21. The opinion of *Habash v. City of Salisbury, Md.* is instructive when the plaintiff has failed to properly allege or provide record evidence of the racial amicus of the defendant.

In *Habash v. City of Salisbury, Md.*, a nightclub owner brought a civil rights action against the city and certain city officials, alleging that they purposefully drove the nightclub out of business because it catered to a black clientele. The district court granted the defendants' motion for summary judgment, finding that there was no evidence of racial animus. With respect to several of the defendants, the court concluded that the plaintiff's "proof on this point is thin to the vanishing point." *Id*. at 443. The court summarized the plaintiffs evidence of racial bias as consisting of the following: "there is racial tension in Salisbury, Maryland, there is a history of racial discrimination in the United States and the eastern shore of Maryland, Club Vissage's clientele on hip-hop nights is predominantly black, the Board banned two drink specials being offered by two hip-hop clubs (Vissage and Andromeda), a Board employee (Rickards) told [the

plaintiff] that Vissage could not sell drinks for less than $1.00, and Rickards told [the plaintiff] that he would be required to show cause at a hearing in order to renew his liquor license." *Id.* The court went on to hold that "[n]one of this evidence, whether considered singly or collectively, could persuade a fair-minded jury that the Board, its members, or Inspector Rickards are bigoted. [The plaintiff's] argument is based on the false syllogism that the Board's actions hampered a club whose clientele was black, ergo the Board's actions must have been motivated by race. This syllogism cannot substitute for the type of solid proof required to withstand a motion for summary judgment." *Id.*

Given that only a limited percentage of the Plaintiff's events actually featured a hip hop or rap artist, no fair-minded jury could conclude that either BSO, Israel, or Adkins acted in retaliation for the Plaintiff's "speech." Just like in *Habash*, here, the Plaintiff's only evidence of racial amicus is the false syllogism that the Defendants actions hampered a club whose clientele may have been African American, ergo the Defendants' actions must have been motivated by race. Therefore, the there is a clear lack of a causal connection between Plaintiff's speech and Defendants' actions. Additionally, the Plaintiff has not identified any record evidence showing that Adkins or Israel acted in response to the Plaintiff's protected speech[2], either by directing subordinates to engage in unlawful actions or by failing to stop them from acting unlawfully. *See Keating v. City of Miami,* 598 F.3d 753, 764–65 (11th Cir.2010) (for a supervisor to be liable under § 1983, plaintiffs much establish a causal connection between the actions of the supervising official and the alleged constitutional violation). Neither Adkins nor Israel personally select establishments for patrol, nor did they direct officer to conduct improper activity. *See* SOF at ¶¶ 9-10; 21-25. And, although Adkins knew of police activity at the Plaintiff's premises, there is no support for the contention, other than sheer speculation, that Adkins or Israel knew that any police actions were allegedly conducted in retaliation for protected speech. The lack of causal connection dictates that this claim be dismissed.

**E. Even if the Court determines there was actual retaliatory action taken against the Plaintiff, the Plaintiff suffered no injuries and its speech was not chilled**

---

[2] "At no time did the Broward Sheriff's Office have policy, formal or informal, in regard to harassing, retaliating, or discriminating against Club Cinema or its patrons in anyway." *See* SOF at ¶ 22. Moreover, "Sheriff Scott Israel never personally directed any officers to 'close' Club Cinema down." *See* SOF at ¶¶ 24-25.

The Eleventh Circuit has held "that the injury-to-the-plaintiff requirement cannot be ignored." *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). The simple fact that Plaintiff alleges an "excessive" law enforcement presence without offering any evidence of an actual adverse retaliation is insufficient to constitute a First Amendment violation. The Plaintiff in *Hallandale* made the same argument, and the Eleventh Circuit disregarded it. "The closest plaintiff has come to [demonstrating an actual or impending concrete injury] is the bald assertion . . . that the mere existence of the policy 'has a chilling effect on the freedom of speech rights of those City of Hallandale employees . . . .' " *Id.* at 761. Relying on *Laird*, 408 U.S. at 1, the Court held that "[a]llegations of subjective 'chill' " are not adequate. *City of Hallandale* at 761. To support a claim of chilled speech, a plaintiff "must show that the defendants' conduct resulted in something more than a 'de minimis inconvenience' to the exercise of their First Amendment rights." *Bethel*, 221 Fed. App'x. at 813. Moreover, in response to the Defendants' Request for Production regarding documentation evidencing the Plaintiff's damages, the Plaintiff only responded with tax returns. Obviously, tax returns alone are not sufficient record evidence to prove the Plaintiff's allegations of financial loss. As the Plaintiff has not provided any evidence of actual damages, its claim should be dismissed.

## IV.     DEPRIVATION OF EQUAL PROTECTION

Plaintiffs have not alleged and cannot prove they are members of a protected class and therefore have asserted an equal protection claim under the "class of one" theory. They have alleged they were treated "differently than other similarly situated [venues]." [ECF 67 ¶¶ 268-276]. As the Eleventh Circuit has emphasized, "[t]o prove a 'class of one' claim, the plaintiff must show (1) that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral [regulation] for the purpose of discriminating against him." *Leib v. Hillsborough Cnty. Pub. Transp. Com'n,* 558 F.3d 1301, 1307 (11th Cir. 2009); *Eisenberg v. City of Miami Beach,* 1 F. Supp. 3d 1327, 1340 (S.D. Fla. 2014).

### A.  Plaintiff has not provided any similarly situated venues

Class of one equal protection claims generally require plaintiffs to identify comparators in the pleading in order to show intentional, discriminatory treatment different from others similarly situated. *Eisenberg*, 1 F. Supp. 3d at 1340 (citing *Village of Willowbrook v. Olech,* 528

U.S. 562 (2000); *Campbell v. Rainbow City,* 434 F.3d 1306 (11th Cir.2006); *Glover v. Mabrey,* 384 Fed.Appx. 763 (10th Cir.2010)). "That the plaintiff was treated differently than a similarly situated comparator is a crucial element of an as-applied equal protection claim." *Dibbs v. Hillsborough County, Fla.,* 67 F. Supp. 3d 1340, 1354 (M.D. Fla. 2014). Indeed, "in the context of 'class of one' claims," "the 'similarly situated' requirement must be rigorously applied." *Leib,* 558 F.3d at 1307 (citing *Douglas Asphalt Co. v. Qore, Inc.,* 541 F.3d 1269, 1275 (11th Cir.2008); *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1207 (11th Cir.2007)). The purpose of the similarly situated requirement is to avoid "subject[ing] nearly all state regulatory decisions to constitutional review in federal court and deny[ing] state regulators the critical discretion they need to effectively perform their duties." *Leib,* 558 F.3d at 1307 (quoting *Griffin,* 496 F.3d at 1203). And "[e]ven in run-of-the-mill discrimination cases, [the Eleventh Circuit has] emphasized that plaintiffs are not permitted simply to 'rely on broad generalities in identifying a comparator.'" *Id.* (quoting *Griffin,* 496 F.3d at 1204) (analyzing whether comparators were "prima facie identical in all relevant respects" (citation omitted)). More specifically, a plaintiff is required to prove that all similarly situated comparators are "*prima facie* identical in all respects." *Campbell*, 434 F.3d at 1314.

In *Campbell,* the plaintiffs submitted five alleged "similarly situated" comparators to the court alleging that they were all treated differently by the city than were the plaintiffs with respect to the application of an ordinance. *Id.* The court found that none of the five projects were *prima facie* identical in all respects, and held plaintiffs failed to provide sufficient evidence that they were treated differently than others similarly situated. *Id.* Specifically, plaintiff failed to submit record evidence of what the individual developers had submitted to the city, that the developments mentioned received the same tentative approvals as the plaintiffs, or that the developments themselves were of the same nature, i.e. residential, commercial, etc. *Id.*

Here, Plaintiff has failed to identify even one comparator which is *prima facie* identical in all respects. Plaintiff contends that the businesses allegedly similarly situated to it are the Pompano Beach Amphitheater, Swinging Richards, Culture Room, Kingshead Pub, Body Shop Night Club, Tropicane Night Club, Cheetah, Diamond Dolls, Club Pink, Booby Trap and Flavors. [ECF 67 ¶¶ 268-276].

The Plaintiff has failed to come forward with any evidence regarding how or why they believe the above referenced venues were similarly situated to its establishment. For reference,

the Plaintiff's establishment primarily hosts musical performances and has a capacity of approximately 2,500 people. *See* SOF at ¶ 20. In stark contrast, the Pompano Beach Amphitheater and grounds offers permanent, stadium style seating for up to 2600 guests, and the overall capacity of the venue is closer to 10,000. *See* SOF at ¶ 28. Swinging Richards was known as an all nude adult entertainment bar that caters to homosexual men. *See* SOF at ¶ 29. It is *not* a venue for musical performances like the Plaintiff. Culture Room is a music venue in Fort Lauderdale, FL[3] with a 650 person general admission capacity, it cannot accommodate 2,500 people like the Plaintiff's facility. *See* SOF at ¶ 30. Kingshead Pub, is a British pub, *not* a concert hall, with a maximum occupancy of only 52 people. *See* SOF at ¶ 31. Body Shop Night Club, Cheetah, Diamond Dolls, Club Pink, Booby Trap and Flavors are all adult entertainment venues featuring nude dancers, which would make them completely different from the Plaintiff's business. *See* SOF at ¶¶ 32, 34. Tropicante Night Club was a dance club in Deerfield Beach, FL. However, Tropicante was shut down in May 2018 due to its history of criminal activity, including a shooting that had four victims. *See* SOF at ¶ 33. As such, it would appear that—if the Plaintiff's allegations against the Defendants are taken as true—the Plaintiff and Tropicante *both* had a high amount of police activity, and, therefore, Plaintiff's claims of being treated differently would be incorrect. Further, both Colonel Hale and Major Adkins believe the above described venues are not similar to the Plaintiff in regard to venue capacity, entertainment type, and/or location. *See* SOF at ¶ 27. There is simply no evidence that the Plaintiff was similarly situated to the comparators highlighted in the Plaintiff's Amended Complaint.

**B. Even assuming that the alleged comparators were similarly situated to Plaintiff, they were not treated disparately**

Plaintiff asserts that it was treated differently than its alleged comparators. [ECF 67 ¶¶ 268-276]. However, Plaintiff has not come forward with any admissible evidence to prove this claim. Plaintiff contends that it was harassed by the Defendants, allegedly at the direction of Sheriff Israel, by surveillance and monitoring at the Plaintiff's business and that such monitoring was greater than the surveillance conducted by the police at similarly situated establishments. However, the Plaintiff has come forward with no evidence to support this allegation, much less any evidence to show that, it actually occurred. As such, the Plaintiff cannot prove an essential

---

[3] The City of Fort Lauderdale is policed by its own law enforcement department, not Browed Sheriff's Office. *See* SOF at ¶ 30.

element that the Defendants "unequally applied a facially neutral [regulation] for the purpose of discriminating against [it]." *Leib,* 558 F.3d at 1307; *Eisenberg,* 1 F. Supp. 3d at 1340. Therefore, the Plaintiff's equal protection claim should be dismissed.

**C. Even if the Court determines there was actual retaliatory action taken against the Plaintiff, the Plaintiff suffered no injuries**

The Eleventh Circuit has held "that the injury-to-the-plaintiff requirement cannot be ignored." *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). The simple fact that Plaintiff alleges an "excessive" law enforcement presence without offering any evidence of discrimination is insufficient to constitute an Equal Protection claim. The Plaintiff in *Hallandale* made the same argument, and the Eleventh Circuit disregarded it. Moreover, in response to the Defendants' Request for Production regarding documentation evidencing the Plaintiff's damages, the Plaintiff only responded with tax returns. Obviously, tax returns alone are not sufficient record evidence to prove the Plaintiff's allegations of financial loss. As the Plaintiff has not provided any evidence of actual damages, its claim must be dismissed.

**V.     CLAIMS AGAINST BSO**

**A. BSO is entitled to summary judgment with respect to Plaintiff's *Monell* claims in Count II and IV of the Amended Complaint because there is no evidence that BSO had a custom, practice or policy of retaliation or discrimination which was the "moving force" behind Plaintiff's alleged injury**

Foremost, according to Major Adkin's review of official records maintained by BSO, "the Broward Sheriff's Office stopped going to any shows put on at Club Cinema after November of 2016. There were no officers providing off-duty details and the Broward Sheriff's Office stopped sending police officers to any of the shows unless there was a fire/rescue call, which would respond." *See* SOF at ¶ 13. As such, it would appear that on the face of the pleadings, any of the Plaintiff's claims that the Defendants had "excessive" police presences after November 2016 are completely baseless. [ECF 67 ¶¶ 107-123; 244-260].

The Plaintiff's *Monell* claim against BSO is based upon their contention that Israel, in his official capacity as Sheriff, was aware of the retaliatory and discriminatory actions allegedly occurring at the Plaintiff's business, but nevertheless failed to take any action to stop it or otherwise ratified these actions. A local government is liable under 42 USC § 1983 for its policies and customs that cause constitutional torts. *McMillian v. Monroe Cnty., Ala.,* 520 U.S.

781, 784, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (municipality not liable under section 1983 unless a municipal policy causes claimed constitutional deprivation); *Mandel v. Doe,* 888 F. 2d 783, 791 (11th Cir. 1989). *Respondeat superior* or vicarious liability is not a basis for rendering municipalities liable under Section 1983. *Monell,* at 694-95.

Therefore, in order to succeed against BSO, Plaintiff would still be required to prove that BSO's custom, practice or policy, displaying "deliberate indifference," was the "moving force" behind Israel and Adkins's actions and actually caused the Plaintiff's alleged injury. Mere negligence is insufficient to impose liability on a municipality and its officials under § 1983. *Davidson v. Cannon*, 474 U.S. 344 (1986); *Daniels v. Williams*, 474 U.S. 327 (1986). Municipal policy may be found in written ordinances and regulations, affirmative decisions of individual policymaking officials, *Pembaur v. City of Cincinatti*, 475 U.S. 469, 483-84 (1986), or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

Although *Canton* involved a "failure to train" claim, its holdings nevertheless apply with respect to Plaintiff's claims in the instant case. In *Canton*, the Court held that a direct causal link must exist between a specific alleged deficiency in training and the particular violation alleged, stating that "'the identified deficiency in [a] training program must be closely related to the ultimate injury.'" *Id.*, 489 U.S. at 391. As discussed above, the record evidence establishes that no constitutional violation occurred in this case. Moreover, there is a complete absence of evidence to establish that the BSO had an official policy or custom of retaliatory or discriminatory conduct which adversely affected protected speech or the Plaintiff's equal protection. Further, "at no time did the Broward Sheriff's Office have policy, formal or informal, in regard to harassing, retaliating, or discriminating against [the Plaintiff] or its patrons in anyway." *See* SOF at ¶ 22. Therefore, BSO cannot be held liable. Further, to the extent that the claim against BSO alleges constitutional harm apart from what has been discussed above, there is no record evidence for a reasonable jury to infer that BSO had a policy or custom that caused, or was the "moving force" behind, the purported constitutional violations. *See City of Oklahoma v. Tuttle,* 471 U.S. 808, 819–24 (1985). As such, the Plaintiff's claims against BSO should be dismissed.

**B. BSO is entitled to summary judgment with respect to Plaintiff's *Monell* claims in Count II and IV of the Amended Complaint because there is no evidence that that ISRAEL or ADKINS violated Plaintiff's Equal Protection rights**

BSO may not be held liable unless an individual Defendant (for which the BSO is responsible) is first found liable for violating Plaintiff's constitutional rights. "Sheriff Scott Israel never personally directed any officers to 'close' Club Cinema down." *See* SOF at ¶¶ 24-25. Moreover, "Between 2013 and January 2019, [Adkins] had no responsibility for drafting the assignments of any officers assigned to [Club Cinema], nor was [Adkins] involved in any decision making concerning off-duty details at Club Cinema, or on-duty details that may have been created." *See* SOF at ¶ 15. Plaintiffs have not come forward with any evidence to demonstrate that Sheriff Israel violated their rights, nor have they generated a dispute of fact with respect to any material issue. Accordingly, he is entitled to summary judgment. Inasmuch as there is no basis to conclude that Adkins or Israel, individually, violated Plaintiff's constitutional rights, Plaintiff's *Monell* claim against the BSO necessarily fails. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986). Accordingly, BSO is entitled to summary judgment with respect to Counts II and IV.

## VI. ISRAEL, IN HIS INDIVIDUAL CAPACITY, AND ADKINS ARE ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F. 3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F. 3d 1340, 1346 (11th Cir. 2002)); *Fontanez v. Lamberti*, 2011 WL 4499016 *5 (S.D. Fla. 2011). It permits officials to perform their duties, without the threat of civil liability, if they act in a lawful manner. It is immunity from suit rather than a mere defense to liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S. Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). Essentially, "[u]nless the [officer's] act is so obviously wrong in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity." *Snider v. Jefferson State Cmty. Coll.*, 344 F. 3d 1325, 1328 (11th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In order to be entitled to the qualified immunity defense, a government official must demonstrate that the acts

complained of were committed within the scope of the officer's discretionary authority. *See Kingsland*, 382 F. 3d at 1232.

In order to be entitled to the qualified immunity defense, a government official must demonstrate that the acts complained of were committed within the scope of the officer's discretionary authority. *See Kingsland*, 382 F. 3d at 1232. The Plaintiff is then required to show lack of good faith on the Defendant's part.

Here, the Plaintiff has not even questioned that Israel and Adkin's actions, of which it complains, took place within their discretionary duties. Thus, the burden shifts to the Plaintiff to show lack of good faith on the Israel and Adkin's part, which burden can only be met by demonstrating that his actions: (1) *violated a constitutional right*, and (2) that right was clearly established at the time of the incident. *See Garczynski v. Bradshaw*, 573 F. 3d 1158, 1165-66 (11th Cir. 2009); *Courson v. McMillian*, 939 F. 2d 1479, 1487 (11th Cir. 1991). The Plaintiff cannot satisfy this burden under these facts.

Although Plaintiff has plainly failed to establish any constitutional violation individually by Israel or Adkins, as discussed *supra*. In an abundance of caution, they assert qualified immunity with respect to Plaintiff's claims. *See Hope v. Pelzer*, 536 U.S. 730 (2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)); *Saucier v. Katz*, 533 U.S. 194 (2001). There is no dispute, here, that Israel, in his individual capacity, and Adkins were acting within the scope of their discretionary authority, if they did indeed requisition a police presence near the Plaintiff's premises in the interest of public safety. *See Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir 2002). Thus, the burden shifts to the Plaintiff to show that Israel and Adkins violated some clearly established law, which the Plaintiff cannot do as no constitutional violation occurred in this case. Further, the Plaintiff has not established that Israel and Adkins alleged actions, if true, were not objectively reasonable. Accordingly, Israel and Adkins respectfully submit that even if the Plaintiff could state a colorable claim against them, they are entitled to qualified immunity as a matter of law.

In addition, the Plaintiff has not shown, that Israel "directed" Adkins, or any other officer, to act in a manner that would violate the Plaintiff's constitutional rights, or even that Israel "knew" that Adkins or any other officer would do so. *See supra* fn. 2. There is certainly no documentary evidence or testimony, other than the Plaintiff's unsupported allegations, to show that Israel had knowledge of, agreed to, acquiesced in or approved any improper conduct.

Without such a showing, its claim cannot withstand summary judgment. *See, e.g., Taylor v. Alvarez*, 2008 WL 1840719 (S.D.Fla. 2008) (affirming dismissal of supervisory liability claims absent a showing of sufficient facts to support a causal connection) (*citing Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (noting that vague and conclusory allegations could not establish supervisory liability). *See also, Detris v. Coats*, 2012 WL 4208051 (M.D.Fla. 2012) (dismissing supervisory liability claim on the basis that a mere recital of the elements of the cause of action does not support a claim).  Likewise, there is no evidence to support, that Sheriff Israel "directed" his subordinates to act unlawfully. *See Gonzalez*, 326 F.3d at 1361-62. Accordingly, it bears repeating, the Plaintiff has not causally linked Israel to the alleged constitutional violation in this case and he is entitled to qualified immunity as a matter of law.

Absent a violation of clearly established law, or a violation of the Plaintiff's constitutional rights by Israel and Adkins, the claims against Sheriff Tony and the Broward Sheriff's Office also cannot proceed. *See, e.g., Garczynski,* 573 F. 3d at 1170 (11th Cir. 2009) (where plaintiff failed to show he was deprived of his constitutional rights by the deputies, there was no need to explore whether the sheriff violated his rights). As such, if Adkins and Israel are entitled to qualified immunity under the facts of this case, then the claims against BSO should also be dismissed.

## VII.   DEFENDANTS ARE ENTITLED TO REASONABLE ATTORNEY FEES UNDER 42 U.S.C. § 1988

Pursuant to 42 U.S.C. § 1988, "[i]n any action or proceeding to enforce a provision of section . . . 1983 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . ." Where the defendant is the prevailing party, a court may award attorney fees "upon a finding that the plaintiff's action was frivolous, unreasonable, and without foundation, even though not brought in subjective bad faith." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). Moreover, "if a plaintiff is found to have brought or continued such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense." *Id*. at 422. The Defendants assert that based on the analysis of the Plaintiff's claims discussed *supra,* along with complete lack of record evidence to support the Plaintiff's claims, the Plaintiff action is frivolous, unreasonable, and without foundation. As such, the Defendants request their reasonable attorney's fees and costs should they prevail in this action.

WHEREFORE, the Defendants, SHERIFF GREGORY TONY, in his official capacity, SHERIFF SCOTT ISRAEL, individually, and MAJOR WAYNE ADKINS, respectfully request that this Court grant this motion for summary judgment, and that this Court grant such other relief as may be proper under the circumstances.

## CERTIFICATE OF GOOD FAITH CONFERENCE

I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to do so or has made reasonable efforts to confer with all parties or non-parties who may be affected by the relief sought in the motion, but has been unable to do so.

Dated: September 4, 2019

Respectfully submitted,

/s/ Kenneth J. Miller
FBN: 865583
Email:  Service@hpslegal.com
HALICZER PETTIS & SCHWAMM, P.A.
One Financial Plaza, Seventh Floor
100 SE 3rd Avenue
Fort Lauderdale, FL 33394
*Attorneys for Defendants TONY, ISRAEL and ADKINS*
Telephone:  954-523-9922
Facsimile:  954-522-2512

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 4th day of September, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Kenneth J. Miller
KENNETH J. MILLER

<u>MAILING LIST</u>

USA ENTERTAINMENT, et al. v. BSO, et al.
CASE NO. 18-CV-26740-UU
OUR FILE NO:  1027.0192

Sanford R. Topkin, Esq.
TOPKIN & PARTLO, P.L.
1166 West Newport Center Drive - #309
Deerfield Beach, FL  33442
*Attorney for Plaintiff*
954-422-8422
954-422-5455 - FAX
E-MAIL DESIGNATION:   stopkin@topkinlaw.com; chansen@topkinlaw.com

Cindy Rhodes Victor, Esq.
KUS RYAN, P.L.L.C.
2851 High Meadows Circle - #120
Auburn Hills, MI  48236
*Co-Counsel for Plaintiff*
248-364-3090
E-MAIL DESIGNATION:   cvictor@victorfirm.com; cvictor@krslaw.biz; smccollum@krslaw.biz

Michael Thomas Burke, Esq.
JOHNSON, ANSELMO, ET AL.
2455 E. Sunrise Blvd. - #1000
Ft. Lauderdale, FL  33304
*Attorneys for Fisher, Burrie and City of Pompano Beach*
954-463-0100
954-463-2444 – FAX
E-MAIL DESIGNATION:  burke@jambg.com; Cardona@jambg.com